# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

BRUCE A. PRATER,

               Plaintiff,

v.                                                          CIVIL  ACTION  NO.  3:07-0789

HENRY SCHEIN, INC., a corporation
authorized to and conducting business
in the State of West Virginia,

               Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Motion for Summary Judgment (doc. 27) of Defendant, Henry Schein, Inc.  Plaintiff, Bruce Prater, opposes this Motion.  For the following reasons, the Court **GRANTS** Defendant's Motion as to all claims.

## I.
## Facts

Defendant distributes medical, dental and veterinary products and services to office-based practitioners.  Plaintiff sold dental equipment for Defendant since it purchased his previous employer in 2001.  Plaintiff continued in these duties until his termination on August 13, 2007.

On August 10, 2007, Plaintiff attended Defendant's national sales meeting awards dinner. Along with Jim Rogers and Travis Knapp, fellow sales associates, Plaintiff sat at a table that included Teresa Savinelli and Andrea Goldberg, both of whom were also employed in sales by Defendant.  The dinner lasted three to four hours, and Plaintiff consumed six to eight beers.

The following day, Chris Peterson, Defendant's Director of Support Administration, reported to Kim Leininger, a Human Resources Manager for Defendant, that Savinelli and Goldberg had complained of the conduct of Plaintiff, Rogers and Knapp at the dinner. Leininger and other Defendant management promptly began an investigation into the alleged incident by interviewing Savinelli and Goldberg. The women stated that Plaintiff, Rogers and Knapp had introduced themselves by asking whether the women were sisters, because they were so pretty and looked alike. According to the women, after learning they were from New Jersey, one of the men said, "Oh, we know all about those Jersey girls," and Plaintiff made a hand gesture indicating oral sex. Although the women stated that they were married, had children and were uninterested, the men persisted. Specifically, the women claimed that Knapp passed sexual notes to them and that one of the men told Savinelli that she "wouldn't have three names" if she were married to him. One of the men also introduced the women to a co-worker by stating, "This one's pregnant, so you don't have to worry about having sex with her." More generally, the women reported that Plaintiff talked the most and that Rogers encouraged him. At some point in the evening, Tracy Bush, another employee of Defendant, also told the men to "knock it off." Leininger states that both women were upset, and that Savinelli cried, when discussing the men's conduct.

Next, Plaintiff, Rogers and Knapp were interviewed. They stated that although they were joking amongst themselves, nothing had been directed at the women. Leininger indicated that the men confirmed that one of them had made the "Jersey Girl" comment, but Plaintiff states that, during the meeting, Rogers acknowledged making the comment. Plaintiff also says that Rogers supported Plaintiff's denial regarding making an obscene hand gesture. During this meeting, Plaintiff apologized repeatedly, stated that he "didn't offend anyone intentionally" but that it was

possible something inappropriate was said, and indicated that he would apologize directly to the women.  Knapp also acknowledged passing notes and making the "easily offended" comment, although Plaintiff insists he was unaware during the dinner that Knapp had passed any notes. Defendant immediately suspended the men.

On Monday, August 13, Leininger emailed Gary Anderson, Defendant's Director of Human Resources, and stated that "it was pretty clear that Bruce Prater (the older guy) was the talker." Later that day, Anderson sent an email to Tim Sullivan, President of Henry Schein Dental, and other employees of Defendant stating:

> I will still reach out to [Plaintiff, Rogers and Knapp] to take their statements this afternoon as they are entitled to have their 'day in court.'  On Tuesday, corporate is having a 75th anniversary function in NYC and I will be out of pocket.  But we'll use that day as 'time separation' so it doesn't look like we took their statements and made a pre-decision to dismiss.

But Sullivan rejected both Anderson's reasoning and proposed course, replying: "At the end of the day, I'm not too worried about how they feel about that anyway.  They provided their statements on Saturday morning and we are taking action based on those along with those of eye witnesses and the victims themselves."

Also on August 13, management for Defendant held a conference call to discuss the investigation and Defendant's anti-harassment policy.  That policy specifically forbade sexual harassment and defined it as "any unwanted . . . sexual advances [or] offensive talk about sex or sexuality," including "jokes."  Management determined that all of the men had violated this policy and terminated all three the same day.  At the time they were terminated, Plaintiff, Rogers and Knapp were 59, 44 and 36, respectively.

Anderson called Plaintiff to inform him of his termination.  During their conversation, Plaintiff referred to Savinelli and Goldberg as "those girls" "three or four times," until finally Anderson interrupted Plaintiff and told him that referring to women as girls was "old school" and a "demeaning and derogatory term of itself."  Anderson then faxed Plaintiff a termination letter recounting the findings of the investigation.  This letter was sent only to Plaintiff.  However, when Plaintiff later sought employment with another dental sales company, it insisted on seeing the letter. After Plaintiff provided it to them, the company then refused to hire Plaintiff, citing the letter's contents as the reason.

It is not clear to whom Plaintiff's sales territory was assigned.  Plaintiff asserts that a woman in her "mid- to early 30s" was hired to replace him.  Rogers names the same woman, although he only says that "[d]uring his employment with [Defendant], [he] did not know [her] as an employee of [Defendant]."  Defendant argues that Plaintiff and Rogers lack personal knowledge of this alleged fact and that their claims are inadmissible hearsay.  Instead, Defendant presents evidence that no one "replaced" Plaintiff, but rather his accounts were merely redistributed among current sales associates.

## II.
## Summary Judgment Standard

"[Summary] judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will

draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III.
### Discussion

### 1. Age Discrimination Under the West Virginia Human Rights Act

#### a. Prima Facie Case

In his complaint, Plaintiff alleges age discrimination in violation of the West Virginia Human Rights Act, W. VA. CODE § 5-11-1 *et seq.* (1979). This act prohibits employers from "exclud[ing] from, or fail[ing] or refus[ing] to extend to, a person equal opportunities because of . . . age . . . ." W. VA. CODE § 5-11-1 *et seq.* (1979). "In order to make a prima facie case of employment discrimination, the plaintiff must prove that: (1) That the plaintiff is a member of a protected class[;] (2) That the employer made an adverse decision concerning the plaintiff[;] (3) But for the plaintiff's protected status, the adverse decision would not have been made." *Conaway v. Eastern Associated*

*Coal Corp.*, 358 S.E.2d 423, 429 (W. Va. 1986).  In this case, Defendant concedes that Plaintiff can establish the first two elements of the prima facie case, but it contends that he cannot establish the third.

Since *Conaway*, the West Virginia Supreme Court of Appeals has clarified the third component of the prima facie case, stating: "Use of the 'but for' language in [the *Conaway*] test may have been unfortunate, at least if it connotes that a plaintiff must establish anything more than an inference of discrimination to make out a *prima facie* case."  *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 161 (W. Va. 1995).  This "inference" can be shown by "adduc[ing] evidence that: (1) the [plaintiff] was a member of a protected class . . .; (2) the [plaintiff] provided competent, capable, and loyal service to her employer; (3) the [plaintiff] was discharged; and (4) the [plaintiff] was replaced by someone not of her protected class."  *Barefoot*, 457 S.E.2d at 162.

To determine whether Plaintiff can establish the necessary inference of discrimination, the Court applies the four considerations discussed in *Barefoot*.  As stated, Defendant acknowledges the existence of the first element, that Plaintiff is a member of a protected class due to his age.  Similarly, Defendant does not argue, and has agreed at oral argument, that Plaintiff was apparently a competent, capable, and loyal employee.  Obviously, Plaintiff was discharged.  However, the parties dispute whether Plaintiff "was replaced by someone not of [his] protected class."  For purposes of this motion only, the Court accepts Plaintiff's proffered evidence on this point and assumes that Plaintiff has established his prima facie case.

### 2. Legitimate Non-discriminatory Reason

After a plaintiff has made out his prima facie case, "the burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason [LNDR] for the challenged employment action." *Barefoot*, 457 S.E.2d at 160 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and drops from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 507 (internal quotations omitted).

As a LNDR, Defendant offered Plaintiff's alleged conduct at the awards dinner. Such conduct, as alleged, violated Defendant's anti-harassment policies and would clearly serve as a LNDR. Indeed, Plaintiff does not, and could not, seriously challenge sexual harassment as a sufficient basis for termination of an employee.

### 3. Pretext

"Of course, after the employer has set out his reason for the decision, the employee [has] the chance to rebut the employer's evidence with a showing that the stated reason was merely a pretext for discriminatory motive." *Conaway*, 358 S.E.2d at 430. Plaintiff may carry this burden by showing that the LNDR was implausible and, therefore, pretextual. *Barefoot*, 457 S.E.2d at 487. However,

> The reason need not be a particularly good one. It need not be one which the judge or jury would . . . act[] upon. The reason can be any other reason except that the plaintiff was a member of a protected class. If the fact finder believes that the proffered reason was the true reason for the decision, then the employer, while he may be guilty of poor business practices, is not guilty of discrimination.

*Conaway*, 358 S.E.2d at 430.

In support of his position that Defendant's LNDR was merely a pretext for a discriminatory motive, Plaintiff presents evidence that at the time of his firing he was, and had been for several years, a "successful and dutiful employee . . . with no prior disciplinary problems." He also presented statements by Rogers and himself that he did not make the "Jersey girls" comment nor any sexual hand gestures. He further observes that Rogers had a record of misconduct and that Knapp admitted to passing notes. (Plaintiff also notes that Rogers had been reprimanded for some prior conduct previously.) He claims that Defendant "jumped to conclusions about his conduct and failed to meaningfully investigate the true facts of the occurrence at the awards dinner in an attempt to seize the opportunity to get rid of Mr. Prater, an older employee." In Plaintiff's view, Defendant grouped him with Rogers and Knapp "to shield itself from an age discrimination claim." As motive for why Defendant would resort to such measures to terminate an admittedly successful employee, Plaintiff suggests that Defendant sought to effectively recoup the benefits of a recently expired non-compete clause by discrediting Plaintiff in the eyes of other potential employers.

However, the proffered motive does not withstand scrutiny. Plaintiff claims he was fired because of his age. He points out that his contract with Defendant included a non-compete clause which had expired just six weeks prior to his termination. According to Plaintiff, Defendant contrived the discharge for sexual harassment to keep Plaintiff from competing with Defendant via a new employer. But if Defendant wanted to fire Plaintiff because of his age, why should it wait until the non-compete clause expired? Plaintiff had been in a protected class due to his age for the duration of his employment with Defendant. It seems a much simpler and surer means of preventing Plaintiff from competing with Defendant would have been to terminate Defendant while the non-compete remained in effect. Defendant could not predict that Savinelli and Goldberg, or anyone else

-8-

for that matter, would bring allegations of sexual harassment against Plaintiff.  It is beyond reason for Plaintiff to claim that Defendant intended to terminate Plaintiff due to his age and that it was merely waiting for a pretext to justify such termination.

Plaintiff also argues that Defendant revealed its discriminatory motive in the comments its management made about and to Plaintiff.  Specifically, Plaintiff believes Defendant's true, discriminatory motive is revealed in Leininger's email describing him, parenthetically, as "the older guy" and Anderson's statement to him that referring to women as girls is "old school."  At best, Plaintiff only offers a "scintilla" of evidence that Defendant's LNDR was pretextual or that discrimination was the real reason behind his termination.  Defendant received a complaint about Plaintiff's conduct from two women who had never met Plaintiff.  The women alleged several instances of inappropriate conduct and attributed at least some of it to Plaintiff.  For example, they stated that Plaintiff made a hand gesture to them indicating oral sex.  Rogers reportedly told Defendant that Plaintiff did not make such a hand gesture.  Defendant was under no duty to credit the statement of Rogers, who was apparently friendly with Plaintiff, above the statement of Savinelli and Goldberg, who, again, had never met Plaintiff and had no apparent reason to falsely accuse Plaintiff.  The Court also observes that Defendant might have found Savinelli and Goldberg to be credible based on the obvious emotion they showed at recounting the conduct of the men at the awards dinner.

It is likewise of little or no import that Rogers had a past history of misconduct or that Knapp admitted to misconduct at the awards dinner whereas Plaintiff, arguably, did not.  Plaintiff's conduct, as alleged by Savinelli and Goldberg, violated its anti-harassment policy and, by itself, gave Defendant reason to terminate Plaintiff.  Similarly, Defendant was not required to obtain

admissions of wrongdoing from the men before firing them.  Even if Plaintiff did not admit to violating the anti-harassment policy, Defendant had ample evidence upon which to base its decision.

The Court reminds Plaintiff that it does not sit in final judgment of the merits of Defendant's proffered reason, only the sincerity behind it.  "If the fact finder believes that the proffered reason was the true reason for the decision, then the employer, while he may be guilty of poor business practices, is not guilty of discrimination."  *Conaway*, 358 S.E.2d at 430.  Plaintiff has not adduced sufficient evidence to allow a reasonable jury to find that Defendant's LNDR was a pretext. Consider Plaintiff's "smoking guns," of sorts, the two comments made by Defendant management using the words "old" or "older."  Leininger emailed Anderson that "Bruce Prater (the older guy) was the talker" at the awards dinner.  As Defendant correctly points out, "the individuals involved in the investigation were from all over the country and most did not know Prater, the two other men [Rogers and Knapp], or the two females who reported the harassment [Savinelli and Goldberg]." Thus the Court agrees that Leininger's "older guy" comment was "merely descriptive."  Similarly, Anderson's "old school" comment was also innocuous.  In his deposition, Plaintiff stated that he referred to Savinelli and Goldberg, grown women, as "girls" "three or four times" until, finally, Anderson interrupted him and said "that that [referring to women as girls] was old school and . . . [a] demeaning and derogatory term of itself."  Here, Anderson was merely pointing out to Defendant that his choice of language, while perhaps once viewed as acceptable, is now viewed by many as offensive.  Accordingly, this statement does not constitute evidence of a discriminatory motive.

Finally, Plaintiff's reliance on *Barefoot* is misplaced because, unlike Plaintiff, the plaintiff in that case offered evidence of pretext.  In *Barefoot*, a Native American nursing assistant was terminated after she allegedly struck a patient.  The plaintiff in that case, however, responded with

-10-

evidence that this proffered reason was a pretext.  Specifically, "as proof of pretext" "the plaintiff offered evidence that other employees who were not members of the . . . protected class hit patients and were not discharged." *Barefoot*, 457 S.E.2d 485 & n.14.  She also offered "evidence that the employer had purged all other [Native Americans] from its workforce over a period of six to eight months." *Id.* at 485.  Thus the *Barefoot* court concluded that the evidence supported a conclusion that "the defendant's failure to discipline others for similar conduct evidenced pretext [] and [that] the defendant was on a mission to purge Native Americans from its workforce." *Id.* at 486.

Defendant cites to *Shell v. Metropolitan Life Insurance Co.* 396 S.E.2d 174 (W. Va. 1990). In that case, a fifty-one year-old insurance salesman was terminated after declining sales. *Id.* at 176. Prior to his termination, he received a letter from his employer warning him about his low sales. *Id.* at 179.  Three other salespeople received a similar letter.  *Id.*  Of these, two were in their twenties, but the third was in the protected class due to his age.  *Id.*  His sales improved, and he was not fired. *Id.*  The fate of the other two letter recipients is not clear.  *Id.*  However, the *Shell* court observed that "[o]ther sales representatives identified by [the plaintiff] as having been discharged were all younger than forty years old and outside the protected class."  *Id.*  Ultimately, the court concluded that the plaintiff "failed to produce any evidence that [the defendant] discharged him because of his age."  *Id.*

To allay Plaintiff's concerns, the Court notes that it does not believe that there exists "a blanket permit for an employer to discriminate against an older employee" anytime it takes similar adverse action against younger employees.  However, the Court does find the facts of this case closer to *Shell* than *Barefoot*.  Savinelli and Goldberg made similar allegations against Plaintiff, Rogers and Knapp.  Defendant investigated the conduct of all three simultaneously.  Each was given

-11-

an opportunity to give his version of what transpired at the awards dinner.  Defendant concluded

from its investigation that all three had violated its anti-harassment policy.  Accordingly, Defendant

terminated all three on the same day.  On the day of their termination, Plaintiff was 59, Rogers was

44, and Knapp was 36.  Although Rogers had a prior disciplinary record, there is nothing to indicate

that he would not have been terminated had he had no record.  Although Knapp admitted to passing

notes, there is nothing to indicate that he would not have been terminated had he not admitted to

doing so.  Thus Defendant treated Rogers and Knapp as it did Plaintiff.  Therefore, the Court finds

that Plaintiff has not raised a disputed issue of material fact, and no reasonable jury could find in his

favor.


### 2. Defamation

Plaintiff's complaint also alleges a claim for defamation.  In West Virginia, "[t]he essential

elements for a successful common law defamation action by a private individual are (1) defamatory

statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the

plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury.  *Rice v. Cmty.

Health Ass'n*, 40 F. Supp. 2d 783, 786 (S.D. W. Va. 1998).  This  formulation leaves Plaintiff with

one obvious problem: He has conceded that Defendant has not provided his termination letter to any

third parties.[1]  To establish this otherwise absent element, Plaintiff urges the Court to adopt the

doctrine of compelled self-publication.

_____

[1]The Court is aware that Defendant argues that, even if publication were found, such
publication was privileged in this instance.  The Court finds it unnecessary to its holding to resolve
the applicability of any privilege.

The Oregon Court of Appeals has set forth the elements of compelled self-publication in this way:

> [A] plaintiff may assert a claim for compelled self-publication defamation in the employment context when: (1) the defendant employer makes a defamatory statement to the plaintiff employee; (2) it was reasonably foreseeable to the defendant that the plaintiff would be under a strong compulsion to disclose the content of that statement to prospective employers; (3) the plaintiff, *under compulsion*, communicates the defamatory statement to a prospective employer; and (4) because of that communication, the plaintiff was damaged.

*Downs v. Waremart, Inc.*, 903 P.2d 888, 896 (Or. Ct. App. 1995). The California Court of Appeals gave the following explanation for its adoption of compelled self-publication:

> The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement.

*Id.* at 895 (quoting *McKinney v. County of Santa Clara*, 168 Cal. Rptr. 89, 94 (Cal. Ct. App. 1980)).

Plaintiff argues that the termination letter was defamatory and that it was reasonably foreseeable to Defendant that Plaintiff would face strong pressures to disclose it while searching for another sales position. Plaintiff also argues that he only disclosed the letter to the other dental sales company after it insisted upon viewing the letter. Finally, he asserts that he was damaged when the company refused to hire him based on the letter's contents. In Plaintiff's view, there is a strong and foreseeable causal link between Defendant's actions and his inability to obtain alternative employment that justifies a finding of publication.

-13-

Apparently, no West Virginia state court has addressed compelled self-publication. However, this district considered, and rejected, the doctrine in *Rice v. Community Health Ass'n*. 40 F. Supp. 2d 783 (S.D. W. Va. 1998).  Plaintiff attempts to distinguish *Rice* on the basis that the plaintiff in that case "fail[ed] to demonstrate actual (or potential) publication of the allegedly defamatory letter . . . ."  *Id.* at 786.  While true, this failure was not behind the court's decision. Instead, the *Rice* court observed that, in *DeLeon v. Saint Joseph Hospital*, 871 F.2d 1229 (4th Cir. 1989), "[t]he Fourth Circuit refused to adopt [a] self-publication claim, finding that 'otherwise, the theory of self-publication might visit liability for defamation on every . . . employer each time a job applicant is rejected.'" *Rice*, 40 F. Supp. 2d at 786 (quoting *DeLeon*, 871 F.2d at 1237).  The court then concluded, "*For the same reason*, this Court rejects Plaintiff's theory of defamation through self-publication."  *Id.* (emphasis added).

If a West Virginia court were to address compelled self-publication, this Court is far from convinced that it would adopt the doctrine.  This district has previously recognized that the courts of West Virginia have often looked to the Restatement (Second) of Torts in deciding defamation claims.  *Thacker v. Peak*, 800 F. Supp. 372, 387 (S.D. W. Va. 1992); *see, e.g., Havalunch, Inc. v. Mazza*, 294 S.E.2d 70, 75 (W. Va. 1981) (in defamation case, looking for guidance to Restatement as opposed to "old West Virginia defamation cases" that were not "directly on . . . point").  Looking at the Restatement, the Court observes that it rejects any compelled self-publication substitute for the publication element of a defamation claim: "One who communicates defamatory matter directly to the defamed person, *who himself communicates it to a third party*, has not published the matter

-14-

to the third person if there are no other circumstances.'"[2] RESTATEMENT (SECOND) OF TORTS § 577 cmt. m (1977) (emphasis added).

Nor do cases cited by Plaintiff compel this Court to break with its precedent and adopt the doctrine of compelled self-publication. For instance, Plaintiff emphasizes language by the Fourth Circuit Court of Appeals in *DeLeon* stating "that the Maryland Court of Appeals, at least on the facts presented here, would not adopt self-publication." 871 F.2d at 1237. This statement is hardly a ringing endorsement of adoption of self-publication under Maryland law, let alone West Virginia law. Indeed, of those district courts within the Fourth Circuit that have considered compelled self-publication in the employment context, all, including district courts in West Virginia and Maryland, have rejected it. *See  also Pacquette v. Nestle USA, Inc.,* 2007 U.S. Dist. LEXIS 33448, at *26-*27 (W.D. Va. May 7, 2007) ("The publication element of defamation cannot be met by self-publication in Virginia.").

Plaintiff also cites to the Oregon Court of Appeals calculation "that roughly 20 other courts have considered the issue, with a slight majority recognizing the doctrine."*Downs*, 903 P.2d at 894. Again, this statement hardly compels this Court to move West Virginia from the apparent slight minority of states that do not recognize compelled self-publication to the apparent slight majority that do. Moreover, Plaintiff ignores language in *Downs* that suggests to this Court that a more restrained approach is appropriate. As the *Downs* court observed, "Federal courts exercising diversity jurisdiction appear less inclined to determine, in the first instance, that their forum states

---

[2]The illustrations accompanying comment m do not suggest that the context in which Plaintiff published the termination letter would qualify as "other circumstances" under the Restatement. Rather, these illustrations find such circumstances where a defamatory letter is written to a blind person or in a foreign language, with the knowledge that the recipient is likely to seek out a third party to read the letter for him.

would recognize compelled self-publication defamation." 903 P.2d at 895 n.8. With this statement in mind, and based on the foregoing analysis, this Court chooses to adhere to precedent and reject the doctrine of compelled self-publication.

Accordingly, the Court finds that summary judgment is appropriate for Plaintiff's defamation claim. At oral argument, counsel for Plaintiff represented, and the Court agrees, that a grant of summary judgment on Plaintiff's age discrimination and defamation claims also would make summary judgment appropriate for Plaintiff's intentional infliction of emotional distress claim.

## IV.
## Conclusion

Accordingly, for the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (doc. 27) as to all claims.

The Court **DIRECTS** the Clerk to send a copy of this written Order and Opinion to counsel of record and any unrepresented parties.

ENTER: October 22, 2008

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE